# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JAMES WHITE,      :

  Plaintiff,     :
             Case No. 3:13cv00171

 vs.         :
             District Judge Thomas M. Rose

CAROLYN W. COLVIN,   : Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,   :

  Defendant.    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I. Introduction

Plaintiff James White brings this action under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Plaintiff protectively filed his application on February 20, 2009, alleging that he has been disabled since January 1, 1996.[2] [3]  (*PageID##* 170-72).  He claims to be disabled due to bipolar disorder, sleep

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2]Plaintiff originally filed for benefits in April 2008. The claims were denied and Plaintiff did not seek reconsideration. (*PageID##* 101-07).  Plaintiff also filed an application for disability insurance benefits, which was denied on res judicata grounds.  (*PageID##* 110-12, 173).

[3]Under the controlling regulations, a plaintiff cannot receive benefits for any period prior to the filing of an application for SSI benefits. 20 C.F.R. § 416.335.  SSI benefits cannot be awarded retroactively. SSR 83-20, 1983 WL 31249, at *1, *7 (1983).

apnea, restless leg syndrome, obsessive compulsive disorder, a stroke, diabetes,

depression, high blood pressure, intestinal problems, allergies, and a sinus infection.

(*PageID##* 196, 247).  After his application was denied during the initial administrative

proceedings, Plaintiff was provided with a hearing before an Administrative Law Judge

("ALJ").  On October 26, 2011, ALJ Amelia Lombardo issued a decision concluding that

Plaintiff was not under a "disability" within the meaning of the Social Security Act, and

therefore not eligible for SSI.  (*PageID##* 42-56).  The ALJ's decision and the resulting

denial of benefits later became the final decision of the Social Security Administration.

This case is presently before the Court upon Plaintiff's Statement of Errors (Doc.

#7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc.

# 11), the administrative record (Doc. # 6), and the record as a whole.

## II.  <u>Background</u>

### A.  <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 50 years old at the time of the administrative decision.  Thus, he is

considered to be "closely approaching advanced age" for purposes of resolving his SSI

claim.  *See* 20 C.F.R. § 416.963(d); *see also*, *PageID##* 55, 190.  Plaintiff has a "limited"

education, *see* 20 C.F.R. § 416.964(b)(3), *see also PageID##* 70, 205, and no past

relevant work.  (*PageID##* 55, 197).

Plaintiff testified at the administrative hearing that his symptoms from his mental

impairments include choking, throwing up, problems breathing, frustration, and anger.

(*PageID#* 73).  He testified that he has been suffering from anxiety problems for many

years.  (*PageID#* 74).  Plaintiff testified that his mental health problems have been significantly more severe in the 2 ½ years leading up to his hearing.  (*PageID#* 78).  He feels as if others are out to harm him and he is in constant fear of death. (*PageID#* 81).

Plaintiff reported that he only performs housework two days per week, on his "up days."  (*PageID#* 75).  He spends most of his day hiding in his room, talking to himself or his television.  (*PageID##* 77, 82).  Plaintiff also testified that he only sleeps three hours a night because he fears not waking up.  (*PageID#* 84).  Due to his lack of sleep, he is "[c]onstantly tired."  (*Id.*).  Plaintiff also explained that although he currently lives with his children – who are ages seven and nine – he is losing custody of them.  (*PageID##* 69, 71).  At the time of the hearing, he testified there was a custody case and "[t]he lawyer has not been [able] to recommend that I have custody of the kids because he feels I'm unfit."  (*PageID#* 83).

When cross-examined by his counsel, Plaintiff explained that he had not been truthful to the examining psychologist, Dr. Flexman, as to the extent of his problems because he was afraid if he was honest about how bad things were, he would lose his children.  (*PageID##* 79-80).  His mother and niece help him with his kids, *PageID#* 74, however, he described his mother as "a terrorist.  She torments."  (*PageID#* 75).  His brother prepares meals and also helps care for his children.  (*PageID##* 76, 81).

When he entered the hearing room, Plaintiff dragged his hand along the wall for "stability." (*PageID#* 82).  He shook and gulped throughout his hearing while staring at the wall. (*PageID#* 80).  He explained that he was afraid of the ALJ, of being in the

3

closed hearing room, and of being around "these people" (referring to the other hearing participants).  (*PageID##* 81-82).  He further testified that he had not eaten in the day leading up to his hearing because he wanted to avoid having a panic attack and throwing up.  (*PageID#* 83).  He also described that he had difficulty making it to the hearing office; needed to leave and enter the building repeatedly; and avoided elevators occupied by other people.  (*PageID##* 83-84).

## B.  Vocational Expert Testimony

A Vocational Expert ("VE") also testified at the hearing.  The VE described the regional economy as consisting of those counties in Ohio within a 50-mile radius of Dayton, Springfield, and Cincinnati.  (*PageID#* 85).  She stated there are approximately 1.1 million positions available in the region, it is representative of the national economy, and is approximately 1% of the national workforce.  (*Id.*).  When asked by the ALJ to describe jobs in the regional economy at the medium and light exertional levels that require only simple, repetitive tasks that are low stress (defined as no assembly line production quotas and not fast-paced), and require no contact with the general public and only minimal contact with coworkers and supervisors, the VE listed jobs such as hand packager, machine packager, and industrial cleaner at the medium, unskilled level, and hand bander, odd piece checker, and silver wrapper, at the light, unskilled level. (*PageID#* 85-86).

The VE further testified that her testimony is consistent with the *Dictionary of Occupational Titles* ("DOT").  (*PageID#* 86).

When cross-examined by Plaintiff's counsel, the VE acknowledged that all competitive employment involves pace expectations and an employee unable to consistently meet those expectations would be unable to maintain full-time, competitive employment.  (*PageID##* 86-87).  The VE also acknowledged that all work involves at least some contact with a supervisor and an employee must be able to consistently accept and respond appropriately to instructions and criticism in order to maintain employment. (*PageID#* 87).  The VE also testified that employers do not tolerate any more than two monthly absences and anything greater would result in termination, over time.  (*Id.*).

When asked about Dr. Patel's opinion, the VE testified that assuming it is found to be credible and based just on the moderate limitations, it would be work preclusive. (*PageID##* 88-90).

### C.     Relevant Medical Opinions[4]

#### 1.     Advanced Therapeutic Services, Inc./Harry E. Idol, BA, LPC

Plaintiff began receiving mental health treatment through Advanced Therapeutic Services, Inc. ("ATS") in April 2008.  (*PageID##* 720-21).  At his initial evaluation, Plaintiff reported fear of others accompanied by anxiety attacks.  (*PageID#* 720).  Mr. Idol, the evaluating social worker, diagnosed Plaintiff with a panic disorder with

---

[4] As Plaintiff's medical records have been adequately summarized and supported with many specific citations to evidence of record in Plaintiff's brief and the ALJ's decision (Doc. #7, *PageID##* 1524-31; Doc. #6-2, *PageID##* 47-48, 51-53), the recitation of facts contained herein is limited to a summary of the relevant medical opinions.

agoraphobia but ruled out Attention Deficit Hyperactivity Disorder.  Plaintiff was set up

for counseling and an evaluation for medication/somatic services.  (*PageID#* 721).

Plaintiff received counseling with Mr. Idol through at least July 2010.  (*PageID##*

893-918, 1158-72, 1196-99).  Plaintiff reported racing thoughts, depression, agitation,

fidgeting, anxiety, panic attacks, difficulty maintaining a train of thought, and sleep

problems.  Mental status examinations revealed Plaintiff to be angry, stressed,

distractible, irritable, or anxious.  (*Id.*).

On April 16, 2009, Mr. Idol completed a mental status questionnaire.  Mr. Idol

noted that Plaintiff mumbles and at times his speech is mildly pressured.  His mood is

depressed and anxious.  Mr. Idol reported that Plaintiff has numerous fears which limit

his ability to function in public or interact with service providers.  When discussing

Plaintiff's cognitive functioning, Mr. Idol noted that Plaintiff loses focus and has great

difficulty completing tasks.  In terms of his social interaction, Mr. Idol recounted that

Plaintiff "avoids contact with friends and others; he is constantly on guard when out in

public."  (*PageID##* 961-63).

Mr. Idol also completed a daily activities questionnaire, in which he reported that

Plaintiff "has difficulty getting along with authority figures," and has been in fights with

managers and walked off the job secondary to anger or fear.  (*PageID#* 964).  Mr. Idol

also noted that Plaintiff avoids stores whenever possible, microwaves meals, and gets

assistance from his brother in managing his finances.  (*PageID##* 964-65).

6

Plaintiff underwent an updated assessment by Mr. Idol on July 13, 2010.

(*PageID##*1162-72).  Mr. Idol reported that Plaintiff is limited in his activies of daily

living because he does not like to go out of the house, he will walk out of a store if there

are too many people, and will always sit away from others in a waiting room with his

back to the wall.  (*PageID#* 1163).  Mr. Idol noted Plaintiff is extremely tense and

anxious in the office.  He is cooperative, but frequently has difficulty discussing issues.

He will often leave sessions early due to anxiety.  Mr. Idol concluded that Plaintiff's

prognosis "would have to be guarded."  (*PageID#* 1170).  Mr. Idol continued Plaintiff's

diagnoses of panic disorder with agoraphobia and generalized anxiety disorder.  He

assigned Plaintiff a Global Assessment of Functioning ("GAF") score at 40.[5]  (*PageID#*

1171).

When seen on July 27, 2010, Mr. Idol found Plaintiff's demeanor to be withdrawn,

activity slowed, eye contact avoidant, thought content phobic, affect constricted, and

mood both depressed and anxious.  (*PageID#* 1160).

### 2.    Advanced Therapeutic Services, Inc./Luis Justiniano-Toro, M.D.

When seen for a medication evaluation with psychiatrist, Luis Justiniano-Toro,

M.D., Plaintiff was diagnosed with a generalized anxiety disorder with panic attacks and

---

[5]"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Comm'r of Soc. Sec.*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.  The DSM-IV categorizes individuals with a GAF score of 31 to 40 as having "Some impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood."  (*Id.*)

assigned a GAF score of 40.  (*PageID##* 717-19).  Plaintiff continued to treat with Dr.

Toro for medication adjustments through July 8, 2009.  (*PageID##* 716, 877-85,

1187-92).

Dr.  Justiniano-Toro completed a Basic Medical form on behalf of the Ohio

Department of Job and Family Services on August 7, 2008.  Dr.  Justiniano-Toro opined

that Plaintiff's medical conditions include generalized anxiety disorder and panic disorder

with agoraphobia.  He concluded that Plaintiff is unemployable and will continue to be so

for 12 months or more.  (*PageID##* 1205-06).

### 3.  Advanced Therapeutic Services, Inc./Pravesh Patel, M.D.

Plaintiff began treating with Dr. Patel on July 29, 2009.  (*PageID#* 1186).  At his

initial appointment, Dr. Patel found Plaintiff was highly anxious, and experiencing mood

swings, racing thoughts, and panic attacks.  Dr. Patel adjusted Plaintiff's medication.

(*PageID##* 1181-85).  By December 2009, Dr. Patel noted that Plaintiff's depression and

anxiety had increased, his medications were increasing his anger, and he was "unable to

be in crowds."  (*PageID#* 1179).

Dr. Patel's treatment notes in 2010 document anxiety and irregular moods.

(*PageID##*  1151-56, 1173-78).

Mr. Idol and Dr. Patel completed a functional capacity assessment on behalf of the

Ohio Department of Job and Family Services with a scanned date of July 28, 2010.  They

opined that Plaintiff was markedly limited in 17 of the 20 areas of mental work abilities

listed on the form. They also concluded that Plaintiff was unemployable for 12 months or more. (*PageID#* 1239).

Mr. Idol and Dr. Patel also completed a Mental Impairment Questionnaire on July 20, 2011. (*PageID##* 1490-93). Dr. Patel noted Plaintiff's diagnoses as panic disorder with agoraphobia and generalized anxiety disorders, and assigned a GAF score of 40. (*PageID#* 1490). Dr. Patel reported Plaintiff's symptoms to include mood disturbances, recurrent panic attacks, social isolation, and a restricted affect. (*Id.*). Dr. Patel reported that Plaintiff "was consistent in attending his [doctor] and therapy sessions but reported minimal improvement in his ability to function outside of the home." (*PageID#* 1491). Plaintiff's prognosis was guarded. Dr. Patel ultimately opined that Plaintiff's impairments or treatment would reasonably occasion three or more absences per month. (*PageID#* 1492). Plaintiff was found to be markedly or extremely limited in a number of mental work abilities. (*PageID##* 1492-93).

## 4. **Jerry Flexman, Ph.D.**

Plaintiff was examined by consulting psychologist, Dr. Flexman, on behalf of the state agency on August 6, 2008. (*PageID##* 725-29). Plaintiff reported that he has mood swings and depression; "gets angry and then quite depressed"; experiences panic attacks where he hyperventilates; and is uncomfortable around others due to anxiousness. (*PageID##* 725, 727).

As to activities of daily living, Dr. Flexman found the following:

[Plaintiff] is able to handle all of the activities of daily living on his own. He takes the bus or walks when he needs to go someplace. He prepares food throughout the day. Household chores include: dishes, laundry, cleaning and general straightening up around the house. Outside chores are taken care of by family. He goes to the stores once or twice a month. Activities include: going to thrift stores and to the park. He goes to his childrens' activities and works on the computer. He also has a My Space. He denied involvement with clubs or groups. He enjoys eating out. He goes to the library. Hobbies include: working puzzles.

He watches T.V. and D.V.D. movies. He talks with friends. He visits and talks with siblings, parents and children. He babysits for his own children. He talks on the phone as needed. He reads the newspaper and computer materials. He handles his own finances. He denied volunteer work.

Appetite is fair, variable. He is slightly obese and weight is stable.

He goes to bed between 8:30 and 9:00 p.m. and he gets up around 7:30 a.m. He does not nap during the day. He does not feel fatigued during the day. Quality of sleep is fair, variable. He takes sleep medications. He snores and he has sleep apnea. He uses a C-pap machine. He has restless legs syndrome.

(*PageID#* 728). During the mental status examination, Dr. Flexman found Plaintiff was

fidgety, his affect was dramatic, depressed, and his attitude was anxious. (*PageID#* 726).

He remarked that Plaintiff "has a lot of bad thoughts." (*Id.*). He also described Plaintiff

as "anxious and fearful." (*Id.*).

Dr. Flexman diagnosed generalized anxiety disorder, depression, antisocial

personality disorder, and poly-substance abuse in remission. (*PageID#* 728). He

assigned Plaintiff a GAF score of 55. Dr. Flexman opined that Plaintiff was markedly

limited in his ability to interact with the public and moderately limited in his ability to

tolerate work pressures, respond to changes in the work environment, and interact with

coworkers or supervisors. (*PageID#* 729).

10

### 5. **Carl Tishler, Ph.D./Joan Williams, Ph.D.**

State agency psychologist, Dr. Tishler, reviewed the record on April 6, 2009. (*PageID##* 938-55). Dr. Tishler determined that Plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (*PageID#* 952).

Dr. Tishler also completed a Mental Residual Functional Capacity Assessment in which he found that Plaintiff was moderately limited in his ability to do the following: understand and remember detailed instructions; carry out detailed instructions; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (*PageID##* 938-39). Dr. Tishler found all other mental work related abilities were not significantly limited. (*Id.*).

Dr. Tishler concluded that Plaintiff was capable of performing simple one, two, or three step tasks; he would have moderate difficulty with supervision of a negative or critical nature; and would have anxiety during a normal work week. (*PageID#* 940). He concluded that Plaintiff's allegations appear credible. (*Id.*). On October 20, 2010, another state agency psychologist, Dr. Williams, reviewed the record and affirmed Dr. Tishler's opinion. (*PageID#* 1080).

## III. **Administrative Review**

### A.  "Disability" Defined

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements.  Chief among these, for purposes of this case, is the "disability" requirement.  To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. A SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

### B.  Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID##* 45-47; *see also* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

C.      **ALJ Lombardo's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 20, 2009, the application date.  (*PageID#* 47).

At Step 2 of the sequential evaluation, the ALJ concluded that Plaintiff has the severe impairments of lumbar degenerative disc disease, depression, and anxiety.  (*Id.*).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 1.04, 12.04, 12.06 and 12.09.  (*PageID##* 48-49).

At Step 4, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and found that Plaintiff could perform light exertional work.  Due to his mental impairments, the ALJ limited Plaintiff to simple repetitive tasks and low stress work (no assembly line production quotas; work that is not fast paced; no contact with the general public and minimal contact with coworkers, and supervisors).  (*PageID#* 49).

The ALJ further determined that Plaintiff's statements concerning his impairments and their impact on his ability to work are inconsistent with the record as a whole and not entirely credible.  (*PageID#* 51).  Plaintiff has no past relevant work. (*PageID#* 55).

At Step 5, based on the testimony of the VE, the ALJ concluded that – considering Plaintiff's age, education, work experience, and RFC – he is capable of performing as many as 17,000 jobs at the light exertion level in the regional area, including such jobs as hand bander, odd piece checker, and silver wrapper.  (*PageID#* 55).

The ALJ's assessment, along with her findings throughout her sequential evaluation, led her to ultimately conclude that Plaintiff was not under a disability and therefore not eligible for SSI.  (*PageID#* 56).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as

14

adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.   Discussion

Plaintiff contends the ALJ erroneously rejected the opinion of his treating psychiatrists, Drs. Patel and Toro, as well as his treating therapist, Mr. Idol.  (Doc. #7, *PageID##* 1533-41).  Plaintiff also contends that the evidence regarding his activities of daily living is wholly consistent with Dr. Patel's appraisal of his mental health limitations.

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring

the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id.* at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d)

including, at a minium, the factors of supportability, consistency, and specialization.  *See*

20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

The Regulations require ALJs to "always give good reasons ... for the weight

[they] give [a claimant's] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  Social

Security Ruling 96-2p, 1996 WL 374188 (July 2, 1996) provides further that an ALJ's

decision "must contain specific reasons for the weight given to the treating source's

medical opinion, supported by the evidence in this case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

treating source's medical opinion and the reasons for that weight."  *Id.*, 1996 WL at *5.

The good-reasons requirement is "a mandatory procedural protection ...." *Wilson*, 378

F.3d at 546.

In the present case, the ALJ declined to apply controlling or significant weight to

Dr. Patel's opinions. (*PageID#* 54).  The ALJ also noted that because Mr. Idol, Plaintiff's

treating therapist, "is not an acceptable medical source, both opinions will be given the

same weight." (*PageID#* 53).  The ALJ found that Dr. Patel and Mr. Idol's assessments

are not supported by treatment notes. (*Id.*).  The ALJ determined "[t]he basis of these

opinions appears to be the claimant's assertions of agoraphobia and fear of others, as well

as his behaviors while in the ATS office." (*PageID#* 54).

Plaintiff's treatment records, however, document numerous instances in which he

presented with anxiousness. (*PageID##* 877-88, 893-918, 1151-56, 1173-86, 1242,

1433-37, 1443-47, 1453-57, 1479-83).  Mr. Idol reported during his therapy sessions that

Plaintiff was angry, depressed, distractible, irritable, and anxious. (*PageID##* 893-918).

When mental work abilities are at issue, such symptoms constitute supporting medical or

objective evidence. In Plaintiff's case, the ALJ erred by rejecting Dr. Patel's opinions in

this manner.

The ALJ also claimed that Dr. Patel's opinion was "inconsistent with the

claimant's actions, activities of daily living, and behaviors elsewhere," *PageID#* 54, but

the ALJ did not cite to any evidence to support this assertion. *See id.* It is not entirely

clear what types of finding the ALJ wanted to see in Dr. Patel's reports. Under the

Regulations, the existence of a medically determinable impairment requires a statement of

symptoms, as well as psychiatric signs. "Psychiatric signs are medically demonstrable

phenomena that indicate specific psychological abnormalities, e.g. abnormalities of

behavior, mood, thought, memory, orientation, development, or perception, as described

by an appropriate medical source." Listing § 12.00B, Appendix 1, Subpart P, Part 404.

The Sixth Circuit has rejected the need for objective medical evidence to support a

claimed mental impairment:

> [A] psychiatric impairment is not readily amenable to substantiation by
> objective laboratory testing as a medical impairment . . . Consequently, the
> diagnostic techniques employed in the field of psychiatry may be somewhat
> less tangible than those in the field of medicine ... In general, mental
> disorders cannot be ascertained and verified as are most physical illnesses ...
> [W]hen mental illness is the basis of a disability claim, clinical and
> laboratory data may consist of the diagnosis and observations of
> professionals trained in the field of psychopathology. The report of a
> psychiatrist should not be rejected simply because of the relative
> imprecision of the psychiatric methodology or the absence of substantial

documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (citations omitted). Thus, while an ALJ may certainly reject a psychiatrist's opinion, there must be a valid reason to do so, such as a reason to question the diagnostic techniques. In this case, the ALJ provided no such reason as a basis for rejecting Dr. Patel's opinions. For example, when initially assessed at ATS in April 2008, Plaintiff reported fear of others accompanied by anxiety attacks.  (*PageID##* 720-21).  On August 6, 2008, consulting psychologist, Dr. Flexman reported that Plaintiff was fidgety, his affect was dramatic, depressed, and his attitude was anxious.  (*PageID#* 726).  He remarked that Plaintiff "has a lot of bad thoughts."  (*Id.*).  He also described Plaintiff as "anxious and fearful."  (*Id.*).  On July 27, 2010, Mr. Idol found Plaintiff's demeanor to be withdrawn, activity slowed, eye contact avoidant, thought content phobic, affect constricted, and mood both depressed and anxious.  (*PageID#* 1160).

The ALJ also erred by relying on a GAF score of 55 from the consultive examination by Dr. Flexman and by giving "little weight" to the GAF scores of 40 assigned to Plaintiff from ATS.  (*PageID* #52).  The ALJ found that the GAF score from Dr. Flexman was "consistent with the findings of the BDD psychologist who found no more than moderate limitations."  (*Id.*).  The ALJ's reliance on Plaintiff's GAF score, however, was improper.  A GAF score is not an indication of nondisability for Social Security purposes: "The GAF scale, which is described in the DSM-III-R (and the

DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 F.R. 50765 (Vol. 162, August 21, 2000). "Furthermore, the Commissioner 'has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings . . . . The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning." *Kennedy v. Astrue*, 247 Fed.Appx. 761, 766 (6th Cir. 2007)(internal citations and punctuation omitted).

The Sixth Circuit has also noted that "'nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF.'" *Denton v. Astrue*, 596 F.3d 419, 425 (6th Cir. 2010)(quoting *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003)). Indeed, as also noted in *Denton*, "the [GAF] score does not reflect the clinician's opinion of functional capacity." (*Id.*). Rather, a GAF score merely represents a snapshot of a person's "overall psychological functioning," at or near the time of the evaluation. *See Martin v. Comm'r of Soc. Sec.*, 61 Fed. Appx. 191, 194 (6th Cir. 2003); *see also* DSM-IV-TR at 32-34. As such, a GAF assessment is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a

full-time basis.  The relative nature of such scoring is seen in Plaintiff's case because the administrative record contains GAF scores ranging from 40 to 60.

As to Dr. Justiniano-Toro's opinion dated August 7, 2008, the ALJ also gave this opinion "little weight."  (*PageID#* 54).  In rejecting this opinion, the ALJ stated "[h]e had only seen the claimant three times before writing this opinion and his opinion is given little weight for the reasons discussed [regarding Dr. Patel's opinions] including his inconsistent behaviors and normal mental status exams."  (*Id.*).

Thus, instead of relying on a treating psychiatrist's opinion, the ALJ relied on the opinion of  Dr. Tishler, who reviewed the file for the state agency.  (*PageID#* 52).  Yet the ALJ never indicated in her decision that she applied the factors described in the Regulations to Dr. Tishler's opinion.  (*Id.*).  This constitutes an additional error by the ALJ because, in the absence of an opinion that deserves controlling weight, all medical source opinions, including the opinions of record-reviewing physicians must be weighed under the regulatory factors, including supportability, consistency, and specialization. *See* 20 C.F.R. § 416.927(c), (e); see also Social Security Ruling 96-6p.

The error is further evidenced in light of the fact that the reviewing psychologists did not consider the longitudinal record.  Dr. Tishler reviewed the record in April 2009, yet this was before Plaintiff even began treating with Dr. Patel.  The ALJ did not account for such a limited review of the record in her decision, instead, she provided her own lay medical opinion about Plaintiff's inconsistent behaviors and normal mental status examinations identified in Dr. Patel's records.  Yet, "an ALJ must not substitute his own

21

judgment for a physician's opinion without relying on other evidence or authority in the record."  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see Meece v. Barnhart*, 2006 WL 2271336, *8 (6th Cir. 2006)("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.").

There remains the possibility, of course, that the ALJ's errors were harmless.  The Sixth Circuit has explained:

> "'[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'"

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545). In *Wilson*, the Court of Appeals remanded the ALJ's decision for failure to comply with the good-reason rule.  378 F.3d at 550.

Although not deciding the issue, the court in *Wilson* nonetheless discussed the possibility that a violation of the good-reason requirement may qualify as harmless error. *See Wilson*, 378 F.3d at 547–48.  Specifically, *Wilson* considered three possible scenarios that could lead the court to a finding of harmless error.  *Id.* at 547.  First, the court indicated that harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it . . ." (*Id.*).  Second, the court

22

noted that if the ALJ's decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." (*Id.*). Finally, the court in *Wilson* considered the possibility of a scenario "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation." (*Id.*). Since *Wilson*, the Sixth Circuit has continued to conduct a harmless error analysis in cases in which the claimant asserts that the ALJ failed to comply with the good-reason requirement. *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 472 (6th Cir. 2006) (finding that even though the ALJ failed to meet the letter of the good-reason requirement, the ALJ met the goal by indirectly attacking the consistency of the medical opinions); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007) (finding that the facts did not satisfy potential harmless error justifications).

        In this case, the ALJ's failure to comply with the good-reason requirement was not harmless error. First, although Dr. Patel's opinions may be inconsistent with other portions of the record, the record contains no indication that Dr. Patel's opinions "are so patently deficient that the Commissioner *could not possibly* credit it . . ." *Wilson*, 378 F.3d at 547 (emphasis added). Because of Dr. Patel's status as a treating psychiatrist, the ALJ was obligated to justify why she rejected his opinions and reached an inconsistent conclusion.

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions of record are well taken.

## VI.    Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems previously identified.  On remand the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-Step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for SSI should be granted.

Accordingly, the case should be remanded to the Commissioner and the ALJ for

24

further proceedings consistent with this Report and Recommendations.

### IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff James White was under a "disability" within the meaning of the Social Security Act;

3.    This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.    The case be terminated on the docket of this Court.

June 23, 2014

       s/Sharon L. Ovington
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).